[No. A130585. First Dist., Div. Two. May 31, 2012.]

CYNTHIA SOTELO et al., Plaintiffs and Appellants, v.
MEDIANEWS GROUP, INC., et al., Defendants and Respondents.

**COUNSEL**

Cotchett, Pitre & McCarthy, Frank M. Pitre, Niki B. Okcu; Carcione, Cattermole, Dolinski, Stucky, Markowitz & Carcione, Joseph W. Carcione, Jr., Roger W. Stucky, Joshua S. Markowitz and Neal A. Markowitz for Plaintiffs and Appellants.

Perkins Coie, Sue J. Stott and Farschad Farzan for Defendants and Respondents.

**OPINION**

**LAMBDEN, J.**—Cynthia Sotelo, Jose Garcia, Jessica Garcia, Joseph Garcia, Ashley Garcia, Tiffany R., and Brandon L. appeal from the trial court's denial of their motion for class certification in a suit alleging that respondents engaged them, and those similarly situated, to work as independent contractors though they were actually employees, and that as a result of this misclassification, respondents are liable under several causes of action. Appellants seek reversal of the court's order denying class certification. We affirm the order of the trial court.

## BACKGROUND

The initial complaint was filed in 2006 and was later amended several times, culminating in a sixth amended complaint, filed in February 2008. In

this most recent amendment, appellants allege that respondents (who are described as interconnected newspaper publishers and conglomerates operating newspapers in Cal.) hired low-wage "independent contractors" (hereafter IC's) responsible for inserting advertisements into papers, folding and bagging newspapers, delivering newspapers to subscribers, and/or supervising others who performed those tasks. The complaint identifies two tiers of independent contractors: (1) lower level "carriers" who insert, fold, bag, and deliver papers and (2) higher level "distribution contractors" or "district managers" (hereafter distributors) who, whether or not they also carry, oversee carriers and report to acknowledged employees of respondents. Appellants allege that individuals who perform such tasks are actually employees and that the independent contractor arrangement is a sham, used knowingly and deliberately by respondents to evade their legal responsibilities to the employees.

The complaint alleges nine causes of action: (1) fraud, based on the allegedly false representations to the workers that they are independent contractors and not employees; (2) concealment by respondents of the true nature of the employment relationship; (3) violation of California minimum wage and overtime pay laws; (4) failure to pay wages due at termination; (5) failure to maintain records and provide accurate itemized wage statements; (6) failure to provide meal breaks; (7) failure to provide rest breaks; (8) violation of Labor Code section 2802 (indemnification of employee expenses made in the discharge of their duties); and (9) violation of Business and Professions Code section 17200 (unfair or fraudulent business act or practice), alleging, inter alia, that respondents retained gratuities that customers meant to go to carriers.

The complaint specifies the class as "all persons who, between September 1, 2002, and the present, worked at any time for or on behalf of any California newspaper owned by MEDIANEWS GROUP, INC., in folding, inserting advertising materials into, bagging, bundling, loading, and/or delivering said newspaper to its residential subscribers, and/or in overseeing such work by other individuals on any such newspaper's behalf (hereinafter sometimes summarized as 'newspaper assembly and delivery work'), and whom no defendant has acknowledged to be its employee in the performance of such work. Excluded from the class are defendants and individuals whom defendants have acknowledged as their employees at any time since September 1, 2002; the parents, subsidiaries, and affiliates of defendants' companies; the officers and directors of these companies; any entity in which any defendant has a controlling interest; and the legal representatives, successors, and assigns of any excluded persons."

The complaint also identifies two subclasses: (1) a "minor subclass," consisting of "all class members who were under the age of 18 years old at any time while they performed work folding, inserting advertising materials into, bagging, loading, and/or delivering newspapers to subscribers for any of the defendants during the class period," and (2) a "final pay subclass," consisting of "all class members who, during the period after September 1, 2002, have either voluntarily stopped performing newspaper delivery and assembly work on defendants' behalf or have been terminated by any defendant or its agents from continuing to perform such work."

Each of the causes of action listed above were alleged on behalf of all plaintiffs and of the class, except for the fourth cause of action, failure to pay wages due upon termination, which was alleged on behalf of three plaintiffs and the final pay subclass.

In 2010, appellants moved for class certification. In support of their motion, appellants submitted the declarations of the named plaintiffs and 11 additional contractors. Respondents submitted 111 declarations, including 101 contractor and 10 employee declarations. In addition, the evidence submitted in support of and in opposition to the motion contains portions of deposition transcripts, various documents produced during discovery, and attorney declarations.

The evidence in the record indicates that members of the proposed class accomplished their work in a variety of arrangements. Rami Haddad, a distributor, has incorporated a business that has contracts with multiple newspapers, maintains its own warehouse, and engages both employees and IC carriers. Appellant Sotelo began as a carrier and then became a distributor, contracting exclusively with one newspaper. She used the services of approximately 14 IC's who subcontracted with her. Paul Masminster had two routes that he delivered substantially on his own. Some IC's engaged their family members to assist with the contracted work.

Respondents' records identified approximately 5,000 individuals who had signed a contract with a newspaper. However, because putative class members retained the assistance, with or without a contract, of others who remained unknown to respondents, the actual size of the proposed class is unknown.

After the parties had briefed the motion for class certification, the trial court issued a tentative ruling that apparently was much the same as the final order. During the hearing, appellants attempted to address the court's concerns. In response to the court's ascertainability concerns, they proposed restricting the class to those who had signed a contract with a newspaper,

those who had subcontracts with a distributor, and those who had been issued section 1099 forms. They made clear that they were dropping their request to certify a subclass of minors, and they proposed to satisfy the court's concerns over the preponderance of common issues of fact and law by creating other subclasses. They also proposed some procedural methods to address the court's manageability concerns.

The trial court denied appellants' motion for class certification and appellants timely appealed.

## DISCUSSION

### I. *Standard of Review*

■ Class actions in California are governed by Code of Civil Procedure section 382, authorizing such suits "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court."

"To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27], citing *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) This requires an inquiry into numerosity, ascertainability, whether common questions of law or fact predominate, whether the class representatives have claims or defenses typical of the class, and whether the class representatives can represent the class adequately. (See *Linder*, at p. 435.) "Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing." (*Ibid.*) It is the plaintiff's burden to support each of the above factors with a factual showing. (*Hamwi v. Citinational-Buckeye Inv. Co.* (1977) 72 Cal.App.3d 462, 471–472 [140 Cal.Rptr. 215].)

A trial court's ruling on a motion for class certification is reviewed for abuse of discretion. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*).) When there is substantial evidence supporting a trial court's ruling, it will not generally be disturbed unless the court employed improper criteria or made erroneous legal assumptions. (*Id.* at pp. 326–327.)

### II. *Ascertainability of the Proposed Class*

■ The ascertainability requirement is a due process safeguard, ensuring that notice can be provided "to putative class members as to whom the

judgment in the action will be res judicata." (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 914 [107 Cal.Rptr.2d 761] (*Hicks*).) "Class members are 'ascertainable' where they may be readily identified without unreasonable expense or time by reference to official records. [Citation.]" (*Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 932 [179 Cal.Rptr. 287].) In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and the means of identifying class members. (*Miller v. Woods* (1983) 148 Cal.App.3d 862, 873 [196 Cal.Rptr. 69].)

The trial court's order denying the motion for class certification did not contain an explicit finding that the proposed class was not ascertainable, but such a finding is implicit in its analysis and both parties assume such a finding by the court.[1] The court's primary concern was that there were no objective criteria by which class membership could be determined, so that "[t]he determination of whether a person who signed no carrier contract with a defendant nonetheless bagged and delivered papers for a defendant during the class period will devolve into a disputed mini-hearing, requiring sworn statements and/or deposition testimony from that class member, the evaluation of circumstantial evidence, and credibility determinations." The court noted that the evidence showed "one witness (Owusu) [who contended] that he signed an agreement with a defendant, but subpoenaed records demonstrate a factual dispute."

■ Appellants argue here that the court erred in finding that the proposed class was not ascertainable because the court ignored the record and relevant case law. Appellants first rely on language in some authorities that suggests that the ability to identify oneself as a member of a proposed class is sufficient for ascertainability; for example, a "class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on [that] description." (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 14 [64 Cal.Rptr.3d 327] (*Estrada*).) The trial court's order observed that "[t]he class in *Estrada* was narrowly defined to include less than 200 persons, and each had signed an operating agreement with the defendant. *Estrada*, in reciting the permissibility of self-identification, relied upon a case that itself involved defendants with recorded relationships . . . with class members. To the extent these cases addressed an ascertainability issue, it was limited to the issue of the administrative burden of finding persons already identified in defendant's records." The court went on to distinguish the instant case: "Here, we are not faced

---

[1] Instead of finding the proposed class explicitly unascertainable, the court wrote, "While the court's decision does not rest solely on the ascertainability issue, it is one of several considerations that give the court significant pause."

with a speculative administrative burden but (as the class is defined) an actual obstacle to identifying persons who *contend* that they folded and bagged papers during the class period, for one or more defendants: a lack of objective evidence (such as business records) that indicate class membership."

The trial court's observations about *Estrada* are apt. We note, as well, that the class in *Estrada* presented no notice issues, because it involved class members with recorded relationships to the defendant. (*Estrada, supra*, 154 Cal.App.4th 1.) Here, however, where the proposed class contains an unknown number of members who have no recorded relationship with respondents, a serious notice issue results. The theoretical ability to self-identify as a member of the class is useless if one never receives notice of the action.

Appellants argue that notice to members of their proposed class can be accomplished. They propose contacting those class members for whom respondents do have records, and posting notices in respondents' facilities. Those contacted would be asked to identify any other putative class members of whom they are aware. Notice would then be provided to these newly identified individuals. They also contend that distributors have records of carriers with whom they contracted. However, the extent to which distributors may have such records is not evident from the record. As respondents point out, distributors may have no incentive to turn over records of carriers who contracted with them because, if appellants' legal theory is valid, these carriers may have claims against the distributors as well.

Appellants point to a declaration from the vice-president of a class action administration service stating that his firm had developed a notice plan that he believed would reach more than 90 percent of class members. However, this declaration simply describes a direct mail notice plan for the class members who had already been identified and includes no discussion of how notice might be provided to the unknown number of those who remain unidentified.

Appellants also argue that any difficulties with identifying putative class members are due to respondents' failure to keep accurate records and that respondents cannot defeat certification by their own wrongdoing in not maintaining proper records. For this proposition, appellants rely on *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 136 [50 Cal.Rptr.3d 135] (*Aguiar*). In *Aguiar* the dispute concerned certain employees of Cintas who had worked on the company's contracts with the Los Angeles Department of Water and Power (DPW). (*Ibid.*) Cintas was under a contractual obligation to track the employees who worked on DPW contracts, but failed to do so. (*Id.* at pp. 128, 136.) Thus, when the court concluded that Cintas could not defeat class certification, on ascertainability grounds, because of its own failure to

keep records that it was obligated to keep, that obligation was uncontested and independent of the outcome of the employees' suit. Here, any obligation on respondents' part to track all members of the proposed class depends on the merits of the suit being brought. Appellants cannot bootstrap their action merely by assuming as true what they are obligated to prove.

At the class certification hearing, appellants suggested limiting the class to those who had signed a contract with a defendant newspaper, those who had signed a contract with another class member, and those who had received a section 1099 form. The court acknowledged this proposal in its order denying class certification: "While . . . plaintiffs proposed a potential solution to [the ascertainability] issue at the hearing on this motion, the timing of the proposal deprived defendants of a fair opportunity to respond and the court of a record, including admissible evidence, to determine whether it is a sound solution." During the hearing, the court recognized that this proposal still presented a notice issue: "The carriers that you refer to as the subcontractors, we have about 5,000 distributors who you want to be in the class, they each have a contract with one of the newspapers, they may or may not have written contracts with their carriers and their carriers' helpers, they may or may not have issued 1099s. But we're talking about getting discovery from approximately 5,000 individuals and entities who will be part of a certified class but as to whom no discovery thus far has been done. [¶] I don't know how—unless and until all of that were done, we don't know how to get notice to any of these people beyond those with whom there are contracts. We just have very serious manageability problems with a class of this nature even divided as you've suggested . . . ." Appellants' proposal presents the same issue of notice as the class originally proposed and the court did not abuse its discretion by rejecting that proposal.

For those not already identified by respondents' records, there is not an objective means of determining whether an individual is a member of the proposed class. Both the class originally proposed by appellants and the restricted class proposed during the hearing on class certification present serious issues for provision of notice, the interest that the ascertainability requirement is designed to meet. We discern no abuse of discretion in the trial court's finding that the proposed class is not ascertainable.

## III. The Trial Court's Failure to Restrict the Class to an Ascertainable Subset

Appellants argue that, whatever the ascertainability problems with the class they originally proposed, or with the narrowed class that they proposed during the class certification hearing, the class of carriers and distributors that had been identified from respondents' records, numbering at least 5,000, *is*

itself an ascertainable class and the court should have restricted the class to those individuals in order to achieve ascertainability.

■ "[T]his state has a public policy which encourages the use of the class action device . . . ." (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 473; see *Sav-On, supra*, 34 Cal.4th at p. 340.) "[I]f necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable." (*Hicks, supra*, 89 Cal.App.4th at p. 916.) "As it is the court's duty to certify an identifiable and ascertainable class, the court is not limited . . . to the class description contained in plaintiff's complaint." (*Cho v. Seagate Technology Holdings, Inc.* (2009) 177 Cal.App.4th 734, 748 [99 Cal.Rptr.3d 436].) When the proposed class is overbroad, the ascertainability problem may be cured by modifying the class definition. (*Marler v. E.M. Johansing, LLC* (2011) 199 Cal.App.4th 1450, 1462 [132 Cal.Rptr.3d 691].)

Here, the ascertainability issue arises because the proposed class is overbroad, containing individuals for whom no effective notice plan has been proposed. Limiting the class to those identified from respondents' records would result in an ascertainable class; indeed, a list had already been generated during discovery. If, for this group, there had been no issues among the other requirements for class certification, the court should have restricted the class to the ascertainable subset. However, because we find no error, as discussed below, in the court's treatment of the remaining requirements, the court did not abuse its discretion when it did not resolve the ascertainability issue by restricting the class to those already identified.

## IV. *Predominance of Common Issues of Law and Fact*

■ "The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members. [Citation.]" (*Sav-On, supra*, 34 Cal.4th at p. 326.) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. [Citation.]" (*Ibid.*) "[T]his means 'each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.' [Citations.]" (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913–914 [103 Cal.Rptr.2d 320, 15 P.3d 1071].)

■ "A class may be certified when common questions of law and fact predominate over individualized questions. As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages. In order to determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged." (*Hicks, supra,* 89 Cal.App.4th at p. 916, fns. omitted.)

"Predominance is a comparative concept, and 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.' " (*Sav-On, supra,* 34 Cal.4th at p. 334, quoting *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1278 [242 Cal.Rptr. 339].) "Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Sav-On,* at p. 334.) "Nor is it a bar to certification that individual class members may ultimately need to itemize their damages. We have recognized that the need for individualized proof of damages is not per se an obstacle to class treatment [citation] and 'that each member of the class must prove his separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper' " (*Id.* at pp. 334–335, quoting *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964].)

Here, the trial court observed that appellant's motion for class certification failed to address the individual causes of action: "Although plaintiffs bear the burden to show that common issues predominate as to each of the claims and defenses asserted, the motion does not specify which claims should be certified for class treatment and, as a substantive matter, focuses almost exclusively on one issue: whether proposed class members were independent contractors or employees." Nonetheless, the trial court examined the question of whether common questions predominate with regard to several of the individual causes of action and with regard to the overarching issue of whether class members are employees or independent contractors. We examine each of these in turn.

A. *Overtime, Meal Break, and Rest Break Causes of Action*

For the "overtime and break claims" (the third, sixth, and seventh causes of action), the court stated: "Plaintiffs must prove that putative class members in fact worked sufficient days and/or hours to be entitled to overtime and sufficient hours in a day to be entitled to meal and/or rest breaks. These inquiries involve the examination of different facts from the classification question; the motion, however, fails to discuss whether there is common

evidence on this issue." The court went on to state that the evidence indicated "a wide variation among carriers in the number of hours they worked each day . . . and that their ability to take breaks turned on factors that varied substantially across the proposed class . . . . [¶] Similarly, on the overtime question, it appears that routes and helper arrangements varied such that not all routes would take more than 8 hours per day to fold and throw. Several class members hired helpers so they could end their workday early . . . . Plaintiffs have not provided evidence . . . showing that substantial numbers of class members were not free to subcontract in this fashion . . . . Defendants, on the other hand, have shown that many carriers felt free to employ help in their routes—and did so. . . . [¶] The record likewise shows that carriers were generally permitted to, and did, obtain substitutes so that they did not have to work 7 days in a week."

Appellants argue that the issues identified by the trial court go to damages and primarily rely on *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286 [105 Cal.Rptr.3d 443] (*Jaimez*). In *Jaimez* the plaintiff alleged that the defendant had deliberately misclassified route sales representatives (RSR's) as exempt in order to avoid paying overtime and had failed to provide meal and rest break periods. (*Id.* at p. 1289.) The plaintiff sought class certification and submitted nine declarations of former RSR's in support of his motion. (*Id.* at p. 1293.) In opposition, the defendant submitted declarations of 25 putative class members which stated that they were allowed and encouraged to take meal breaks when they desired. (*Id.* at p. 1295.) The trial court denied class certification because, among other reasons, "common questions of law and fact did not predominate because [defendant's] evidence demonstrated a strong indication of conflicting testimony at trial . . . ." (*Id.* at p. 1296.)

On appeal, the *Jaimez* court reversed, finding that "[t]he trial court misapplied the criteria, focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class treatment.' [Citations.]" (*Jaimez, supra,* 181 Cal.App.4th at p. 1299.) The court determined that "[p]laintiff's 'theory of recovery' involves uniform policies applicable to the RSR's that are more amenable to class treatment. Predominant questions of fact and law include whether [defendant] misclassified RSR's as exempt employees, thereby misapplying meal and rest break requirements, as well as the attendant record-keeping duties. Plaintiff alleges [defendant] consistently administered a uniform corporate policy that violated overtime and meal and rest break requirements." (*Ibid.*) "The fact that individual RSR's may have different *damages* does not require denial of the class certification motion. Furthermore, declarations from a small percentage of objectors do not bar class certification. In sum, the trial court applied improper criteria in evaluating the merits of the [defendant's] declarants' statements rather than considering whether they rebutted plaintiff's substantial

evidence that predominant factual issues (if not legal, too) make this case more amenable to class treatment than to myriad individual adjudications. [Citations.]" (*Id.* at p. 1301.)

Appellants argue that the trial court here made the same error as the trial court in *Jaimez*: "If it is found that the class members are employees, then they will be **entitled** to meal and overtime compensation, and they will have to come forward and prove how much they worked." However, simply having the status of an employee does not make the employer liable for a claim for overtime compensation or denial of breaks. An individual employee establishes liability by proving actual overtime hours worked without over-time pay, or by proving that he or she was denied rest or meal breaks. A class, on the other hand, as in *Jaimez*, may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay, or to miss rest/meal breaks. "Although individual testimony may be relevant to determine whether these policies unduly restrict . . . the [class] as a whole . . . , the legal question to be resolved is not an individual one. To the contrary, the common legal question remains the overall impact of [respondent's] policies on [the class] . . . ." (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1536 [87 Cal.Rptr.3d 518].)

The difference between *Jaimez* and this case is that in *Jaimez*, the plaintiff actually presented the court with a theory of recovery that specified the uniform policies and practices of the defendant that acted to establish liability for overtime. The complaint in *Jaimez* "asserted that [defendant] consistently administered a uniform corporate policy that violated California law with respect to overtime and meal and rest break requirements." (*Jaimez, supra,* 181 Cal.App.4th at p. 1291.) As to the overtime claims, the *Jaimez* court found that the "predominant common factual issues include (1) whether [defendant] had a uniform practice of misclassifying RSR's as exempt; and (2) whether [defendant] had a uniform policy of requiring RSR's to work overtime, but failing to pay them for their overtime hours." (*Id.* at p. 1302.) Appellants' allegation that respondents have misclassified putative class members as IC's rather than employees is only part of the equation. In contrast to *Jaimez*, appellants have not alleged that respondents have a uniform policy that requires putative class members to work overtime.

Appellants' argument is similarly deficient as to the rest and meal break claims. In *Jaimez*, there was an allegation that defendant "had a policy of failing to permit or authorize RSR's to take rest breaks . . . ." (*Jaimez, supra,* 181 Cal.App.4th at p. 1304.) Moreover, Jaimez presented evidence of a common factual issue—that "[t]he delivery schedules made it extremely difficult for RSR's to timely complete the deliveries and take all required rest

breaks." (*Ibid.*) As with the overtime claims, appellants failed to allege a uniform policy on the part of respondents to deny putative members the ability to take rest breaks.

*Jaimez* is not helpful to appellants because appellants have not alleged that respondents have uniform practices or policies, beyond the issue of employee misclassification, that would establish liability for overtime or rest/meal break violations. Nor have appellants, having failed to address these causes of action in their motion, made a factual showing that any such policy could be established by common evidence. Thus, we conclude that the trial court here did not, as did the trial court in *Jaimez*, employ improper criteria in evaluating the evidence before it when it considered the overtime and break claims. Because appellants dispute only the criteria by which the court evaluated the evidence in the record, and not its substantiality, we conclude that the court's determination that common issues do not predominate in the overtime and break claims was supported by substantial evidence and that the court did not abuse its discretion.

### B. *Fraud and Concealment Causes of Action*

In considering whether common issues predominate in appellants' fraud and concealment causes of action, the court wrote: "The motion wholly fails to address plaintiffs' first two causes of action, for fraud and concealment. As pleaded, the fraud cause of action rests upon 'false representations' that were allegedly made both orally, by numerous of defendants' agents, and in writing (contracts); both directly and indirectly. [Citations.] Plaintiffs have done little to show that the same or similar representations were made to members of the putative class, for example, when carriers were presented (if at all) with their IC contracts. [Citations.] Nor have plaintiffs addressed other (potentially individualized) elements of their fraud and concealment claims. [Citations.] This issue is particularly troublesome with respect to persons who folded for other carriers without signing any agreement; their claims would likely be based entirely on oral representations and thus would require individualized inquiries."

At the hearing on the motion to certify the class, appellants apologized to the court for not explaining their theory as to the fraud and concealment causes of action. They explained that, for those who had contracts, their theory was clear: the contracts made the false representation that they were independent contractors and not employees. For the class of all members with written contracts that we found to be ascertainable above (i.e., those identifiable from respondents' records), appellants' clarification that they rely on the representations made in the contracts may address the court's concern about the commonality of the representations that were made, but other problems remain.

Appellants also stated at the hearing that reliance might be presumed under *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082 [23 Cal.Rptr.2d 101, 858 P.2d 568] (*Mirkin*), but did not provide an argument for that proposition. In *Mirkin*, the court stated that "actual reliance can be proved on a class-wide basis when each class member has read or heard the same misrepresentations . . . ." (*Id.* at p. 1095.) Even if we assume that all IC contracts make the same representation, whether a particular class member has read that misrepresentation presents an individual question and not a common question. The case cited in *Mirkin* for reading the same representation is *Occidental Land, Inc. v. Superior Court* (1976) 18 Cal.3d 355 [134 Cal.Rptr. 388, 556 P.2d 750]. In that case, the misrepresentation was contained in a report and each class member "was obligated to read the report and state in writing that he had done so." (*Id.* at p. 358.) Here, although each putative class member, for the class determined to be ascertainable above, signed an IC contract, reliance may not be presumed unless there is a showing that putative class members actually read their contracts and appellants have not made a factual showing that this presents a common rather than an individual inquiry.

Because appellants have the burden of supporting each of the requirements for class certification with a factual showing, there can be no abuse of discretion when a court finds a lack of commonality because the plaintiff has not even attempted to meet that burden, as appellants here failed to do in their motion. Appellants' belated attempts to address the fraud and concealment causes of action at the hearing were not sufficient to remedy the failure of their motion to mention them.

## C. *Predominance of Common Questions in the Issue of Employee Status*

The trial court concluded that the question of whether appellants were employees or independent contractors was the pivotal issue for several of the causes of action. The order stated that "[t]he parties agree that the test for whether a worker is an IC or an employee principally turns on the 'control of work details' exercised by the putative employer, but also considers various secondary factors that incorporate the court's consideration of the protective purposes of the worker-protective legislation."

■ "[C]ourts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship." (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*).) ■ The secondary factors usually considered by courts are "(1) whether there is a

right to fire at will without cause; (2) whether the one performing services is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the services are to be performed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the principal; (9) whether or not the parties believe they are creating an employer-employee relationship; (10) whether the classification of independent contractor is bona fide and not a subterfuge to avoid employee status; (11) the hiree's degree of investment other than personal service in his or her own business and whether the hiree holds himself or herself out to be in business with an independent business license; (12) whether the hiree has employees; (13) the hiree's opportunity for profit or loss depending on his or her managerial skill; and (14) whether the service rendered is an integral part of the alleged employer's business." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1064, fn. 14 [48 Cal.Rptr.3d 563].) These factors " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello, supra*, at p. 351.)

The trial court first concluded that the evidence demonstrated little variance as to the issue of respondents' control over the details of putative class members' work. However, the court stated that "there are so few 'details' in a carrier's work that a newspaper needs (or wants) to control that this factor is not likely to weigh heavily in the merits analysis." Appellants argue that the court applied improper legal criteria by erroneously dismissing the importance of the control factor. However, the court later stated that "[w]hile there are some common issues in the employment status inquiry, most notably some aspects of the 'control of work details' factor, these aspects are not likely to be the focus of this litigation in that they will not consume significant resources compared to the many aspects of the status inquiry that are individualized in nature." This makes it clear that the court was not dismissing the importance of the factor, but commenting on the degree to which the factor was likely to be an issue of actual controversy at trial.

The court then considered the secondary factors and determined that while some of them appeared to be common across the proposed class, there was significant variability across the class as to others. The court focused its attention on the following factors: (1) whether the one performing services is engaged in a distinct occupation or business; (2) the method of payment; (3) whether or not the parties believe they are creating an employer-employee relationship; (4) the hiree's opportunity for profit or loss depending on his or

her managerial skill. After discussing how the evidence supported individual variability as to these factors, the court concluded that "[g]iven the nature of the multi-factor test for the employment relationship, which requires that the factors be examined together, even if certain issues were tried jointly as to a class or subclasses, the remaining individualized issues would have to be determined and then weighed along with the already-determined common issues in order to resolve whether each class member was an employee or independent contractor. It does not appear that trying common issues first would result in any appreciable savings of the court's or the litigants' time."[2]

Appellants challenge the court's assessment of all but one of the factors cited by the court as presenting individualized variability. As to the factor of whether the workers were engaged in a distinct occupation or business, appellants admit that "[w]hile there was some suggestion in the lower court proceedings that this is not a common question because some plaintiffs had their own businesses [citation], plaintiffs seek to represent only those persons who *physically bagged and delivered* papers, and thus the relevant inquiry is whether *those* persons had a distinct occupation." However, the class proposed by appellants specifically includes those "overseeing such work by other individuals." Moreover, the evidence cited by the court was specifically directed to carriers and not distributors: "even assuming that 'distributors' who do not fold and bag papers are taken out of the picture, the record suggests that there has been significant variation among carriers . . . . Some carry products only offered by a single distributor, and others (covertly or openly) carry products from different distributors. The contracts signed by carriers appear to vary in whether they permitted carriers to carry other distributors' publications. Some carriers utilized business cards holding themselves out as a distinct delivery service."

For the factor of the opportunity for profit based on entrepreneurial and management skills, the court found "a wide range among adult carriers, given that some carriers who fold and throw have also employed others to help them on a regular basis, while others have not." The court concluded that

---

[2] This passage controverts another of appellants' arguments. Appellants stress that the legal standard for commonality is comparative. "The relevant comparison lies between the costs and benefits of adjudicating plaintiffs' claims in a class action and the costs and benefits of proceeding by numerous separate actions—*not* between the complexity of a class suit that must accommodate some individualized inquiries and the absence of any remedial proceeding whatsoever." (*Sav-On, supra,* 34 Cal.4th at p. 339, fn. 10.) They argue that the trial court applied improper criteria because "while the lower court here explained in detail why the case would be difficult to manage as a class action, it failed to provide **any analysis whatsoever** of 'the costs and benefits of proceeding by numerous separate actions.' [Citation.]" Thus, their argument goes, the court engaged in a comparison between the complexity of the class suit and the absence of any remedial proceeding instead of the correct comparison. However, the quoted passage here, though short, demonstrates that the court was making the proper comparison.

those who had employed helpers "would generally have more opportunity to profit through using their management skills over multiple routes and carriers, and presumably could avoid being docked for complaints by using extra help to quickly remedy such complaints." Appellants simply argue that this factor does not present an individualized inquiry, but is an "objective determination that has more to do with the nature [of] delivering newspapers." In support, they cite *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 855 [75 Cal.Rptr.3d 887] (*Antelope Valley*) ("A carrier's remuneration is in very large part dependent on nonnegotiated financial terms in the contract rather than on the carrier's initiative, judgment[,] or managerial abilities."). Courts make determinations based on the records before them. The conclusions of fact that the *Antelope Valley* court reached upon its record do not compel the trial court here, or us, to reach the same conclusions.

The trial court found variance in the "method of payment" factor because some carriers were paid by a piece rate and some on a buy/sell basis. Appellants admit that while some contracts specify a buy/sell arrangement, the majority of contracts in the record are for piece rate payment. This may be true about the contracts, but there is no information in the record concerning the numbers of putative class members to which each contract in the record applies.

Finally, the trial court found that the beliefs held by putative class members concerning their relationships with respondents also varied. "The contracts generally recite an independent contractor relationship, but other factors may undermine the contract, such as the failure to explain its terms, a failure to enforce the contract, the carrier's failure to sign a contract, the carrier's inability to read it, etc. [Citation.] Class members' testimony on every one of these issues varies." Appellants concede that this factor may require individual testimony, but that a party's mistaken belief about its employment status is not dispositive. Even if the factor is not dispositive, it is a factor which might be litigated, requiring individual testimony at trial. The court made that point in its order: "While a class members' belief about his or her status will not defeat employment status and, as a subjective standard may be entitled to less weight, it may still be a subject of litigation at trial, given the holistic nature of the inquiry."

Appellants argue that "common questions predominate in the overarching inquiry of whether carriers were misclassified as independent contractors; class treatment is therefore the most efficient way to proceed. The lower court abused its discretion by focusing on the divergent experiences of a select minority of class members and ignoring the overwhelming similarities among the majority." If the court had actually focused on the divergent experiences of a select minority, we might conclude that substantial evidence did not

support the determination of the trial court that a number of factors would require individual testimony. However, appellants point to no evidence in the record that proves the characteristics of the majority. Survey[3] evidence from a well-selected sample of the 5,000 identified class members might have supported appellants' contention, but none is present in the record. Thus, we cannot say that the court's determinations as to the various factors were not supported by substantial evidence.

Even though the court found variability among the class in only a few of the factors, the court observed that the multifactor test "requires that the factors be examined together." Thus, even if other factors were able to be determined on a classwide basis, those factors would still need to be weighed individually, along with the factors for which individual testimony would be required. We find no failure to use proper criteria or improper legal assumptions in this determination.

### D. *Conclusion*

Appellants have failed to demonstrate that in examining whether common issues of law and fact predominate over individual issues, the court made determinations that were not supported by substantial evidence or that the court employed improper criteria or made erroneous legal assumptions. Thus, we affirm the court's conclusions in the predominance inquiry. We note that these conclusions apply to the class that we determined to be ascertainable above, as well as to the class actually proposed by appellants.

### V. *The Failure of the Court to Consider the Relevant IWC Wage Order*

At approximately the same time that the parties filed their briefs for the class certification hearing in this case, the California Supreme Court issued *Martinez v. Combs* (2010) 49 Cal.4th 35 [109 Cal.Rptr.3d 514, 231 P.3d 259] (*Martinez*), a case bearing directly on the tests for employment that are relevant to one of the causes of action.[4]

---

[3] Survey data may provide evidence either in support or opposition to the question of commonality in class action certifications. (See, e.g., *Fairbanks v. Farmers New World Life Ins. Co.* (2011) 197 Cal.App.4th 544, 565 [128 Cal.Rptr.3d 888] [plaintiffs' own survey evidence supported defendant's contention that the issue of policy permanence as a material policyholder consideration was not subject to common proof].)

[4] Appellants' memorandum of points and authorities in support of its motion for class certification was filed on May 7, 2010. *Martinez v. Combs* was announced on May 20, 2010, and was published as modified on June 9, 2010.

· In *Martinez*, seasonal agricultural workers brought an action under Labor Code section 1194 (providing a cause of action for suits involving minimum wages and overtime) to recover unpaid minimum wages. (*Martinez, supra*, 49 Cal.4th at p. 42.) The workers contended that the Industrial Welfare Commission's (IWC) wage order No. 14-2001, titled "Order Regulating Wages, Hours, and Working Conditions in Agricultural Occupations" (Cal. Code Regs., tit. 8, § 11140) governs determination of an employment relationship. (*Martinez*, at p. 42.) The wage order defines "employ" as "to engage, suffer, or permit to work"; "employee" as "any person employed by an employer"; and "employer" as "any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F), (G).) The court held that "the applicable wage order's definitions of the employment relationship do apply in actions under section 1194." (*Martinez*, at p. 66.) Moreover, the court construed the meaning of "employ," under the IWC's definition, to have "three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Martinez*, at p. 64.)

The issue in *Martinez* was whether the plaintiffs, who were indisputably employees of a grower, were also "employed" by produce merchants with whom the grower did business. (*Martinez, supra*, 49 Cal.4th at pp. 42–46.) Although the issue here is very different, as respondents point out, the holding of the *Martinez* court about the applicability of IWC wage orders in determining whether an employment relationship exists (in the context of actions under Lab. Code, § 1194) is not limited to the facts of that case.

Here, IWC wage order No. 1-2001 (Cal. Code Regs., tit. 8, § 11010), titled "Order Regulating Wages, Hours, and Working Conditions in the Manufacturing Industry" would presumably govern.[5] This wage order uses the same definitions of "employ," "employee," and "employer" as the wage order at issue in *Martinez*. (Cal. Code Regs., tit. 8, § 11010, subd. 2(D)–(F).) Under *Martinez*, then, the trial court should not have limited itself to the test for a common law employment relationship because appellants' third cause of

---

[5] "Manufacturing industry" is defined as "any industry, business, or establishment operated for the purpose of preparing, producing, making, altering, repairing, finishing, processing, inspecting, handling, assembling, wrapping, bottling, or packaging goods, articles, or commodities, in whole or in part; EXCEPT when such activities are covered by Orders in the: Canning, Preserving, and Freezing Industry; Industries Handling Products After Harvest; Industries Preparing Agricultural Products for Market, on the Farm; or Motion Picture Industry." (Cal. Code Regs., tit. 8, § 11010, subd. 2(H).)

action, for violation of minimum wage and overtime laws, comes under Labor Code section 1194. The assumption that the common law test was the only applicable test of an employer/employee relationship for the causes of action in this case was flawed. However, this error was harmless. Even if the court had used *Martinez* to determine that the issue of employment status as to the third cause of action was one that could be determined on a classwide basis, the court, as discussed above, had already determined that, even assuming that putative class members were employees, common issues did not predominate in the third cause of action. Thus, consideration of *Martinez* would not have affected the trial court's conclusions.

### VI. *Failure of the Court to Impose Subclasses or Other Creative Devices*

In its order denying the motion for class certification, the court stated: "Given the existence of about 30 potential employers in this case and the differences in their policies and procedures among themselves and over time, the court is surprised that plaintiffs did not initially propose subclasses. Indeed, on reply, plaintiffs made a few general suggestions regarding subclassing, but did not explain if or how the types of subclasses they mention could cure or reduce commonality problems. [Citation.] The court is not confident that subclasses could be utilized in this case, however, given the number of newspapers, the number of relevant issues showing substantial variation in the class, and the fact that many newspapers changed their practices over time." The court concluded that "[p]laintiffs have not provided any meaningful solution to the manageability concerns raised by the lack of commonality described above." Appellants now argue that "any problems in manageability, or other areas giving the court pause, should be solved with the use of subclasses or other creative devices, and not by denying certification outright."

 "Courts seeking to preserve efficiency and other benefits of class actions routinely fashion methods to manage individual questions. For decades '[t]his court has urged trial courts to be procedurally innovative' [citation] in managing class actions, and 'the trial court has an obligation to consider the use of . . . innovative procedural tools proposed by a party to certify a manageable class' [citations]." (*Sav-On, supra*, 34 Cal.4th at p. 339, fn. omitted.) Here, the court considered appellants' proposals, fulfilling its obligation, and found them deficient because they failed to discuss how they would cure the issues the court had identified. There was no abuse of discretion.

## DISPOSITION

The order of the court denying appellants' motion for class certification is affirmed.

Kline, P. J., and Richman, J., concurred.

A petition for a rehearing was denied July 24, 2012, and appellants' petition for review by the Supreme Court was denied September 19, 2012, S204654.