Filed 6/4/13  Howard v. Trans Union CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RICHARD HOWARD,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>TRANS UNION, LLC,<br><br>　　　　Defendant and Respondent. | A133650<br><br>(Contra Costa County<br>Super. Ct. No. C07-02572) |

Plaintiff Richard Howard sought to certify a class of California consumers who allegedly received from defendant Trans Union, LLC, boilerplate descriptions of how it investigated complaints about credit reports—descriptions allegedly lacking the detail required by California's Consumer Credit Reporting Agencies Act (CCCRAA) (Civ. Code, § 1785.1 et seq.).[1]  The trial court denied Howard's motion for class certification on numerous grounds.  We conclude the trial court did not abuse its discretion in denying his motion, and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2004, Howard sued Trans Union because, among other things, his credit report from that agency listed a Wells Fargo loan account he claimed was not his.  (See *Howard v. Blue Ridge Bank* (N.D. Cal. 2005) 371 F.Supp.2d 1139, 1141–1142 [ruling on motions

_____

[1]  All further references are to the Civil Code unless otherwise indicated.

1

in that lawsuit].)  As part of a 2005 settlement agreement, Trans Union agreed to remove the disputed account from Howard's report.

In 2007, according to Howard, Trans Union "reinserted" the Wells Fargo account into his credit record.  While the reinserted account had a different account number from the original, both accounts were for an April 2003 automobile loan from Wells Fargo Financial Acceptance, called for monthly payments of $412, and had high balances either equal to each other or within one dollar (the original account had a high balance of $19,178 or $19,179, and the reinserted account had a high balance of $19,178).  The reinserted account was not being paid off, had been charged off as bad debt, and was a negative mark on Howard's credit.

Howard disputed the reinserted account by letter from his attorney dated June 12, 2007.  Trans Union's response is not in the record, but further correspondence by Howard indicates Trans Union refused to remove the account.  Howard then requested, by letter from his attorney dated July 9, 2007, that a dispute statement be placed on his credit report and that Trans Union provide a description of the procedure it had used to complete its investigation of the disputed account—or "reinvestigation," as it is called in the industry and in the CCCRAA.  The CCCRAA requires consumer credit reporting agencies conducting a reinvestigation to provide, within 15 days of a consumer request, "a description of the procedure used to determine the accuracy and completeness of the information [in the credit report] . . . , including the name, business address, and telephone number of any furnisher of information contacted in connection with that information."[2]  (§ 1785.16, subd. (d).)

_____

[2]  Howard's July 9 letter, apparently by accident, referenced not this CCCRAA section, but a parallel and similarly-worded provision of the Investigative Consumer Reporting Agencies Act, section 1786.24, subdivision (g)(4).  The letter also referenced title 15 United States Code section 1681, subdivision (a)(6)(B)(iii), the Federal counterpart of the CCCRAA, which also requires a credit reporting agency to, upon request, provide "a description of the procedure used to determine the accuracy and completeness of the information [in the credit report] . . . , including the business name

2

Trans Union responded in by latter dated July 25, 2007. The letter began by informing Howard's attorney that "[t]o process your request and protect the confidentiality of the above-referenced consumer's [Howard's] credit report, please send us verification of his or her current address," such as a driver's license or utility bill. The letter also went on, nevertheless, to reference the Wells Fargo account and stated "our records show the information disputed . . . does not currently appear on [Howard's] TransUnion credit report."[3] Then, under a heading termed "General Policy," the letter stated:

> TransUnions's procedure for investigating disputed information is to contact, by mail, electronic means, or telephone, the source of the information. Each source is advised of the above-referenced consumer's dispute and is requested to verify the accuracy and/or completeness of the information reported. Once the verification responses are received, the disputed information is updated accordingly. Changes are reflected on the updated credit report that is sent to the consumer at the conclusion of our investigation. If the consumer has any questions regarding the results of the investigation, please have him/her contact the creditor(s) directly.

The record contains no evidence Howard or his attorney provided the proof of address Trans Union requested or engaged in any further correspondence with Trans Union.

On November 20, 2007, Howard filed the instant putative class action, seeking relief for himself and for similarly situated California consumers, based upon Trans Union's alleged violations of the CCCRAA and California's Unfair Competition Law (UCL).

---

and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available."

[3] Though the letter says this, a credit report dated July 25, 2007, lists the reinserted Wells Fargo account. The confusion appears to arise from the original and allegedly reinserted account having different account numbers. Trans Union was not recognizing the "reinserted" account as identical to the original account, which it had removed as a result of the first lawsuit.

In March 2009, Howard moved for class certification. He sought to certify two classes for relief, solely under the CCCRAA.[4] The first was denominated a "Reinsertion Class," defined as: "All California consumers who disputed and had information removed from their credit reports as a result of the dispute, and who subsequently had such disputed information reinserted in their credit reports without the notice required by Civil Code section 1785.16(c) in the statutory period."[5] The second was denominated a "Description Class," defined as: "All California consumers who requested a description of the reinvestigation process and were provided a form description of the procedure used to determine the accuracy and completeness of the disputed information in the statutory period."[6] On appeal, Howard has abandoned his efforts to certify a Reinsertion Class, and we therefore do not discuss this proposed class further.

[4] The motion does not mention the UCL.

[5] Section 1785.16, subdivision (c), provides in relevant part: "If any information deleted from a consumer's file is reinserted in the file, the consumer credit reporting agency shall promptly notify the consumer of the reinsertion in writing or, if authorized by the consumer for that purpose, by any other means available to the consumer credit reporting agency. As part of, or in addition to, this notice the consumer credit reporting agency shall, within five business days of reinserting the information, provide the consumer in writing (1) a statement that the disputed information has been reinserted, (2) a notice that the agency will provide to the consumer, within 15 days following a request, the name, address, and telephone number of any furnisher of information contacted or which contacted the consumer credit reporting agency in connection with the reinsertion, (3) the toll-free telephone number of the consumer credit reporting agency that the consumer can use to obtain this name, address, and telephone number, and (4) a notice that the consumer has the right to a reinvestigation of the information reinserted by the consumer credit reporting agency and to add a statement to his or her file disputing the accuracy or completeness of the information."

[6] Section 1785.16, subdivision (d), provides in relevant part: "A consumer credit reporting agency shall provide written notice to the consumer of the results of any reinvestigation under this subdivision, within five days of completion of the reinvestigation. . . . (4) . . . [I]f requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the consumer credit reporting agency, including the name, business address, and telephone number of any furnisher of information contacted in connection with that information."

4

As to the Description Class, Howard argued Trans Union "systematically sends out the same form language" he received, and between May 1, 2005 and May 31, 2007, it did so in 270,365 form letters. His sole evidentiary support for this contention was a discovery response Trans Union made in a separate case, *Carvalho v. Credit Consulting Services, Inc.* (Monterey Co. Superior Ct. No. M90093). An interrogatory asked the company to "[s]tate the number of times [it] received a request from a California consumer for a description of the procedure used to determine the accuracy and completeness of the information upon reinvestigation in the period between four years before this complaint was filed and the present." Trans Union, subject to objections, responded: "Between May 1, 2005 and May 31, 2007, Trans Union sent out 270,365 copies of the form letter represented by TU0723 and TU0724." TU0723 and TU0724 were English and Spanish versions of a document, appearing to be an unaddressed draft form letter, containing a short sentence thanking a hypothetical consumer for contacting Trans Union and providing essentially the same "General Policy" language included in the July 25 sent to Howard's lawyer.

Howard argued the sheer volume of form letters sent between May 1, 2005 and May 31, 2007, established numerosity and that all recipients of such letters shared the same claim based on the formulaic and allegedly deficient language. He did not, however, provide a copy of a single one of the 270,365 letters supposedly sent to other putative class members during a time period that ended nearly two months before the July 25 letter sent to Howard's attorney.

The following month, in April 2009, Trans Union filed written opposition to Howard's motion. The company argued Howard had not shown how he, or any of the proposed class members, could plausibly state a violation of the CCCRAA based on the allegedly boilerplate language. It also argued individuals would have adequate incentive to pursue CCCRAA claims because of the remedies available under the statute, so class treatment was not necessary and should be denied.

5

There is mention in the record, but no transcript, of a July 2009 hearing, at which the trial court appears to have postponed ruling on the motion to allow for discovery. The first hearing for which a transcript is provided did not take place until June 10, 2011, nearly two years later. In advance of the June 10 hearing, the court issued a tentative ruling that provided in part:

> "With respect to the [Description Class] . . . , plaintiff seems to have met the burden of showing numerosity. (See Exhibit D to the Declaration of Ron Bochner filed March 12, 2009 [providing evidence Trans Union sent 270,365 copies of a form letter including the 'General Policy' language it also sent to Howard].) However plaintiff has not addressed the issue of ascertainability. In addition, the Court wishes to have the parties address the issue of manageability and superiority. What relief is plaintiff seeking as to the second issue? How would that case be managed? Why would a class action be superior to non-class adjudication?"

At the hearing, the court expressed concern that, in their briefing, the parties had not adequately addressed the Description Class. For example, the court found the briefing lacking on numerosity (despite the tentative ruling), as well as on ascertainability. It also noted there might be concerns about typicality or commonality of issues if the CCCRAA's description obligation could only be enforced in court by consumers who had sought a description of a reinvestigation of an *inaccurate* account: the inaccuracy issue would be specific to each individual. (See *Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 637–638 (*Trujillo*) [the CCCRAA "expressly limits its scope to consumers who have been 'aggrieved'—that is, consumers who have been actually injured" and "does not, as plaintiffs urge, allow plaintiffs, uninjured by violations that have already occurred, to bring CCCRAA causes of action seeking injunctive relief"]; *Carvalho v. Equifax Information Services, LLC* (N.D. Cal. 2008) 588 F.Supp.2d 1089, 1099–1100 (*Carvalho*) ["the rationale for imposing an inaccuracy requirement on reinvestigation claims favors applying that requirement to claims under § 1681i(a)(6)(B)(iii) and its California counterpart, § 1785.16(d)(4)"].)

6

After a lunch break, the trial court further explored the issues of ascertainability and typicality and asked about the 270,365 form letters Trans Union had apparently admitted sending. It wanted to know if Trans Union could identify the recipients. Trans Union's counsel responded "I called at lunchtime and asked about that. It's extremely difficult to find, but it could be probably done manually and would take 200 hours." The court also observed the July 25, 2007, letter to Howard's attorney included not only the boilerplate language, but also additional paragraphs, most notably (1) the paragraph conditioning a further response on proof of identity and (2) the paragraph suggesting there was no entry remaining on Howard's report to investigate. The court was concerned Howard's own situation was not typical of the class he sought to certify—"if the response from Trans Union is to just include the boiler plate along with a more tailored response, then how on earth do we deal with 270,000 responses . . . ?" There was no way to know, the trial court stated, if those 270,000 people got just the boilerplate language, or something else, like Howard, or something different even from the kind of response Howard received. Counsel for Trans Union stated that while some consumers may have gotten the boilerplate language, alone, each of the 270,365 notices was likely to contain additional information.

Based on the parties' lackluster briefing on the Description Class and the discussion during the hearing, the court ordered the parties to submit further briefing and any, relevant evidence, and scheduled another hearing. It told Howard's counsel "it's your job to carry the burden of showing me numerosity, typicality, ascertainability, et cetera. If you don't carry the burden, I'm not certifying [the Description Class]." The court was emphatic: "I'm going to want evidence."

The parties submitted additional briefing, but Howard submitted no new evidence pertaining to the Description Class. During the next hearing on July 29, 2011, the trial court expressed concerns the Description Class was unworkable, because it would include consumers who received the allegedly defective boilerplate language but who

7

ultimately had no inaccuracy on their credit report—and thus would not have suffered cognizable injury under *Carvalho*, *supra*, 588 F.Supp.2d at pages 1099–1100. (See also *Trujillo*, *supra*, 157 Cal.App.4th at pp. 637–638.) The court also stated Howard failed to show typicality because the letter sent to him requested further information, and there was no evidence any of the 270,365 form letters sent out were similar enough so a class could properly be fashioned. The court similarly found no ascertainability or numerosity. On September 7, 2011, the court issued a written order, consistent with its statements from the bench, denying class certification. Howard filed a notice of appeal on November 4, 2011.

## DISCUSSION

Code of Civil Procedure section 382 provides for class actions, stating in part "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue . . . for the benefit of all." (Code Civ. Proc., § 382.) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) "The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470; accord, *Brinker*, *supra*, 53 Cal.4th at p. 1021; *Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326.)

Our review of a "class certification order . . . is narrowly circumscribed." (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) " 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on

8

appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' [Citation.]" (*Ibid.*)

We first turn to the community of interest requirement, and in particular, the requirement that the class representative have claims typical of the putative class. " ' "The cases uniformly hold that a plaintiff seeking to maintain a class action must be a member of the class he claims to represent. [Citations.]" [Citation.]' (*Chern v. Bank of America* (1976) 15 Cal.3d 866, 874 . . . .)" (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 663 (*Caro*).) " 'It is the fact that the class plaintiff's claims are typical and his representation of the class adequate which gives legitimacy to permitting him to bind class members who have notice of the action. [Citations.]' [Citation.]" (*Id.* at p. 664.)

To be typical, it is not enough that some aspect of the claims arise from identical conduct. In *Fairbanks v. Farmers New World Life Ins. Co.* (2011) 197 Cal.App.4th 544, 564–565, for example, the plaintiff sought to certify a class of consumers who were fraudulently induced to purchase insurance policies. Affirming denial of certification, the Court of Appeal held "even if plaintiffs were permitted . . . to proceed with a class action based solely on the allegedly misleading language of the policies, it is still impossible to consider the language of the policies without considering the information conveyed by the . . . agents in the process of selling them." (*Id.* at p. 564.) Because evidence showed

9

"further explanations were provided to many members of the prospective class, and the trial court accepted this evidence . . . plaintiffs cannot obtain a reversal of the denial of class certification on this basis." (*Id.* at pp. 564–565; see also *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 850; *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 154 ["although CBIZ maintained uniform internal policies and was subject to professional standards, the evidence showed that the manner in which those policies and standards were implemented . . . varied depending on multiple factors"]; *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 461 ["While landing or departure [of aircraft] may be a fact common to all" landowners near the airport "liability" for nuisance or inverse condemnation "can be established only after extensive examination of the circumstances surrounding each party."].)

Similarly, in *Caro*, the plaintiff alleged the class was deceived by defendant's claim its orange juice was "fresh." The evidence, however, indicated the plaintiff was not deceived by this claim, but was misled by defendant's claim the juice was "premium." (*Caro*, *supra*, 18 Cal.App.4th at p. 664.) "Because Caro did not claim to be misled in the manner the class was allegedly deceived, the court could not 'decide the issue of the rights of such individuals that might possibly exist.' [Citation.]" (*Ibid.*) His claims were not typical, and "[s]uch determination alone was sufficient to defeat class certification on all Caro's causes of action." (*Id.* at p. 666.)

The trial court's lack of typicality determination here is supported by the record, or perhaps more accurately, is supported by a lack of substantial evidence from Howard. (See *Soderstedt v. CBIZ Southern California, LLC*, *supra*, 197 Cal.App.4th at p. 143 [" 'party seeking certification has the burden to establish . . . a well-defined community of interest' "].) The sum total of the evidence Howard provided on typicality was (1) the July 25, 2007, letter Trans Union sent to his attorney and (2) Trans Union's discovery response in *another case*, indicating it had sent 270,365 copies of a form letter containing the challenged "General Policy" language. In its written ruling, the trial court observed

10

"it is clear" Howard "received a letter that is different" from the form letter he asserted was sent to other putative class members. Howard was "asked to provide some more information." He was also told the claimed inaccurate information was no longer on his credit report, implying there was no meaningful re-investigation to describe. There was no evidence whatsoever regarding the circumstances of *any* of the purported recipients of the 270,365 letters containing the "General Policy" boilerplate language. Thus, there was no evidence any of the form letters similarly sought identifying information and/or indicated there was no credit report entry to investigate. The mere fact all the letters may have contained the "General Policy" language is not enough, standing alone, to create typicality. (See, e.g., *Fairbanks v. Farmers New World Life Ins. Co.*, *supra*, 197 Cal.App.4th at pp. 564–565.)

We similarly conclude the record supports the trial court's conclusions that Howard's evidence falls short of establishing numerosity and ascertainability. (See *Soderstedt v. CBIZ Southern California, LLC*, *supra*, 197 Cal.App.4th at p. 155 ["Nor did Krogh's declaration constitute evidence of numerosity. He declared that there were a total of 119 accountants employed in CBIZ's three offices, but did not specify how many of those accountants were associates and senior associates. Nor did he make any effort to identify how many former CBIZ employees would fit the putative class description contained in appellants' complaint."].) Further, as to ascertainability, Howard presented no evidence on how he would identify the recipients of the 270,365 form letters and determine if he was typical of any of them. Yet, it was Howard's burden to make the requisite showing on this point. The only information in the record is Trans Union's counsel's unsworn, hearsay statement at the June 10, 2011, court hearing that identifying recipients would take 200 hours of manual labor. Thus, not only did Howard make no effort to carry his burden on ascertainability, but it appears there may be serious problems in this regard. (See *Sotelo v. MediaNews Group, Inc.* (2012) 207 Cal.App.4th 639, 648

11

[" 'Class members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records.' "].)

Howard also failed to carry his burden of establishing that a class action is a superior procedural device in this case. (See *Brinker*, *supra*, 53 Cal.4th at p. 1021 ["The party advocating class treatment must demonstrate . . . substantial benefits from certification that render proceeding as a class superior to the alternatives."].) For example, should Howard succeed in obtaining declaratory and injunctive relief that the "General Policy" language fails to comply with the CCCRAA, it is hard to see how, in practice, Trans Union could avoid changing its practices as to other consumers as well. (See § 1785.31, subd. (b) [authorizing individuals to recover injunctive relief].) The CCCRAA also allows individual consumers to recover actual damages, "including court costs, loss of wages, attorney's fees and, when applicable, pain and suffering," and if the violation is willful, not merely negligent, punitive damages between $100-$5,000. (§ 1785.31, subd. (a).) These remedies provide sufficient incentive for a consumer to individually vindicate his or her rights. (See *Gardner v. Equifax Information Services, LLC* (D. Minn., Aug. 6, 2007, No. CIV.06-3102ADM/AJB) 2007 WL 2261688 [collecting cases and finding class action not superior for Federal Fair Credit Reporting Act because of attorney fees provision]; *Hyderi v. Washington Mut. Bank, FA* (N.D. Ill. 2006) 235 F.R.D. 390, 404 ["Precedent teaches that the availability of statutory damages plus the ability to recover attorneys fees and costs provides substantial incentives to bring meritorious individual suits."]; cf. *AT&T Mobility LLC v. Concepcion* (2011) 179 L.Ed.2d 742, 758–759 ["the arbitration agreement provides that AT&T will pay claimants a minimum of $7,500 and twice their attorney's fees" and agreeing "this scheme [is] sufficient to provide incentive for the individual prosecution of meritorious claims" and "the Concepcions were *better off* under their arbitration agreement with AT&T than they would have been as participants in a class action"].)

12

Howard lastly contends the trial court did not give him an adequate opportunity to conduct discovery related to class certification. To begin with, Howard never appropriately raised this issue with the trial court. While Howard's counsel, at the end of the final hearing on class certification, asked the trial court to confirm "this is with prejudice; in other words, we don't have any right to do any further discovery on these issues, this is the final order," this was by no means a request for another continuance and additional discovery. Accordingly, Howard has waived the issue. (See *Arguelles-Romero v. Superior Court* (2010) 184 Cal.App.4th 825, 832, fn. 5 [failure to request additional discovery waives review on petition for writ of mandate].) Moreover, Howard had four years to conduct discovery to meet his burden as a class action proponent. If there was any doubt about what evidence he needed to muster, it was eliminated by the lengthy discussions between counsel and the court at the June 10, 2011 hearing. The trial court made it very clear to Howard it needed to see more evidence in conjunction with the additional briefing, yet Howard presented no additional evidence. Thus, there was no abuse of discretion by the trial court in connection with discovery during the class certification proceedings.

### DISPOSITION

The order denying class certification is affirmed. Respondent to recover its costs on appeal.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

13