Filed 11/15/24  Gonzales v. San Gabriel Transit CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| FRANCISCO GONZALES, | B327003 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC536584) |
| v. | |
| SAN GABRIEL TRANSIT, INC., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maren E. Nelson, Judge.  Affirmed.

Boyamian Law, Michael H. Boyamian, Armand R. Kizirian; Law Offices of Thomas W. Falvey, and Thomas W. Falvey, for Plaintiff and Appellant.

Dunn DeSantis Walt & Kendrick, Kevin V. DeSantis, James A. McFaul, and Bradley A. Lebow, for Defendant and Respondent.

Plaintiff Francisco Gonzales and others were engaged by San Gabriel Transit, Inc. (SGT) to work as drivers. Gonzales alleged SGT misclassified them as independent contractors and violated various Labor Code[1] provisions, the Industrial Welfare Commission's wage orders,[2] and the Unfair Competition Law (Bus. & Prof. Code, § 17000 et seq.). The trial court denied Gonzales's first motion to certify the class. Gonzales successfully appealed. (*Gonzales*, *supra*, 40 Cal.App.5th 1131.)

After the case was remanded, Gonzales filed a renewed motion for class certification. The trial court again denied the motion, finding Gonzales did not show common questions of law or fact predominated over individual issues. The court also found Gonzales failed to show the case was manageable or that class treatment was the superior method of resolving the issues. Gonzales asserts the trial court abused its discretion in denying class certification. We affirm the trial court's order.

---

[1]     All undesignated statutory references are to the Labor Code, unless otherwise indicated.

[2]     In particular, Gonzales alleged SGT violated Wage Order No. 9 (codified at Cal. Code Regs., tit. 8, § 11090 [Wage Order No. 9]). "The [Industrial Welfare Commission] is the state agency empowered to regulate wages, hours and fundamental working conditions for California employees through wage orders governing specific industries and occupations. . . . Wage Order No. 9-2001 regulates wages, hours, and working conditions in the transportation industry." (*Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131, 1139, fn. 2 (*Gonzales*).)

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    The Operative Complaint and Prior Appeal**

In February 2014, Gonzales filed this putative class action seeking to represent current and former drivers engaged by SGT as independent contractors from February 2010 to the present.

In the operative first amended complaint, Gonzales alleged SGT misclassified drivers as independent contractors.  Gonzales alleged causes of action for (1) unpaid wages (§ 1194); (2) failure to pay minimum wage (§ 1194); (3) failure to pay overtime compensation (§§ 1194, 510); (4) failure to provide meal and rest breaks (§§ 226.7, 512); (5) failure to furnish accurate wage statements (§ 226); (6) waiting time penalties (§§ 201–203); (7) failure to reimburse business expenses (§ 2802); (8) common law conversion; (9) unfair business practices (Bus. & Prof. Code, § 17200); (10) misclassification as independent contractors (§ 226.8); (11) recovery for unlawful wage deductions (§§ 221, 223); (12) conversion (§ 450); and (13) accounting.[3]

In January 2016, Gonzales filed his original motion for class certification, which the trial court denied.  Gonzales appealed, and while that appeal was pending, our Supreme Court decided *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*), in which it adopted the "ABC test" for analyzing the distinction between employees and independent contractors for purposes of wage order claims.

This court reversed and remanded the order denying Gonzales's motion with directions that the trial court

---

[3]    In *Gonzales*, this court noted that Gonzales did not challenge the trial court's ruling as it related to his common law claims for conversion or for an accounting, and thus, he forfeited any such challenge.  (*Id.* at p. 1142, fn. 6.)

"(1) evaluate which Labor Code claims enforce wage order requirements, and which do not; (2) as to the Labor Code claims that enforce wage order requirements, apply the ABC test as described in *Dynamex* to determine whether the requirements of commonality and typicality for purposes of certification of a class action are satisfied; (3) as to the Labor Code claims that do not enforce wage order requirements, apply the *Borello* test [referring to *S.G. Borello and Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*)] to determine whether the requirements of commonality and typicality for purposes of certification of a class action are satisfied; (4) as to the derivative Business and Professions Code section 17200 claim, apply the ABC or *Borello* test as appropriate for the underlying alleged unfair business practice; and (5) in the event the court determines class certification is appropriate, complete the analysis by determining whether proceeding as a class action would be superior to alternative methods of adjudication."[4] (*Gonzales, supra,* 40 Cal.App.5th at pp. 1164–1165.)

## B.  Gonzales's Renewed Motion for Class Certification

In February 2022, Gonzales filed his renewed motion for class certification, seeking certification of a class comprised of approximately 560 members.

---

[4]  *Dynamex* applied only to the definition of "employ" for purposes of wage orders and did not reach the question of whether the ABC test should apply to claims under the Labor Code.  (*Parada v. East Coast Transport Inc.* (2021) 62 Cal.App.5th 692, 699, fn. 2.)  However, effective September 4, 2020, the Legislature adopted the *Dynamex* test for purposes of the entire Labor Code.  (*Ibid.*; § 2775.)

4

Gonzales asserted SGT was a company that coordinated transportation services for passengers. SGT had service contracts with various public and private entities. He claimed he was primarily assigned to SGT's Access Paratransit Services, Inc. (Access) contract, which provided transit services for individuals with disabilities. He alleged he was given a list each day requiring him to pick up and drop off certain passengers. Gonzales drove for SGT from about May 2005 until January 2012 and then again from July 2012 to September 2012. He used five different vehicles to perform services for SGT. He leased his first vehicle, purchased the next three, and subleased a fifth from another driver. Gonzales signed two written agreements with SGT: one dated March 16, 2005, and one dated July 30, 2007.

Gonzales argued SGT misclassified him and other similarly situated taxicab drivers as independent contractors. Gonzales contended SGT controlled the drivers' hours, pay, and working conditions, and thus, employed the class members and was liable for treating them as independent contractors.

Gonzales asserted that class members had to comply with numerous requirements imposed by SGT to receive work, including a background check, drug and alcohol testing, and signing a written lease agreement. Gonzales asserted that after drivers signed a written agreement, they had to complete a training session, with Access drivers subject to further annual training, administered by SGT's employees. He alleged SGT also helped drivers keep their business licenses current, fill out necessary paperwork, and obtain proper city permits. Class members were allegedly required to wear uniforms, which included a polo shirt with SGT's logo or a white shirt with black pants, black socks, and black shoes.

5

Gonzales stated class members were assigned vehicles by SGT for picking up and dropping off customers. The drivers were required to pay SGT a fixed weekly lease payment for the use of the vehicle and equipment, such as an on-board computer, radio-dispatch, and meter. Drivers who used their own vehicles (referred to as "owner-operators") had lower lease payments. Gonzales asserted that if drivers did not pay the weekly lease, their onboard computer would be turned off by SGT and their vehicles would be reported as stolen. Drivers also allegedly paid a 10 percent "processing fee" for all passenger fares paid by credit card, coupon, voucher, or originating from SGT's house accounts. Gonzales alleged that drivers were restricted from setting up their own merchant accounts to bypass SGT's 10 percent processing fee and were subject to discipline for doing so.

Gonzales also claimed he was required to pay out of pocket for fuel, radio service to maintain contact with SGT dispatchers, and vehicle maintenance and repairs. He also had to paint his cab specific colors and display the logo of at least one cab company. He stated he worked about 12 hours a day and was never provided with meal or rest breaks.

Gonzales alleged that during his time with SGT, the company never gave him an IRS 1099 tax form. SGT commenced issuing IRS 1099 tax forms for drivers in 2013. SGT has not issued W-2 forms for drivers.

When Gonzales moved for class certification, he proposed a class consisting of "[a]ll non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxi cab or van and paid [SGT] a weekly vehicle lease." Alternatively, Gonzales proposed certification of three subclasses:

(A) "All non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxi cab or van, paid [SGT] a weekly lease, and transported passengers in connection with Access Paratransit Services, Inc.";

(B) "All non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxi cab or van, paid [SGT] a weekly vehicle lease, and transported school children in connection with a school route";

(C) "All other non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxi cab or van and paid [SGT] a weekly vehicle lease."

Gonzales argued common questions predominated among proposed class members when the ABC test was applied. He asserted that although class members signed different versions of the lease agreement, all drivers were subject to the same "operational infrastructure" and treated as "interchangeable" by SGT. Gonzales argued his evidence was overwhelming that the work done by class members was within the usual course of SGT's business. In addition, Gonzales averred class certification was appropriate to resolve the failure to reimburse business expenses claim under the *Borello* test.

Further, Gonzales argued class treatment was superior to other methods of adjudication because all the issues were common to the proposed class. Gonzales's proposed trial plan called for a bifurcated trial with the first phase focusing on "the threshold issue" of whether drivers were misclassified as independent contractors and the second phase on damages.

7

## C.    SGT's Opposition to Class Certification

In opposition, SGT explained drivers performed a variety of services. SGT maintained service contracts, or "house accounts," with school districts, cities, and private entities (e.g., movie studios and hotels) to arrange transportation services for passengers. SGT also coordinated with Access to provide transit services for individuals with disabilities, and with LA Taxi Cooperative, Inc., doing business as Yellow Cab, to provide drivers to transport students with special needs in various school districts. SGT's drivers could also transport passengers from Los Angeles International Airport (LAX). Drivers were not limited to performing one type of service.

SGT asserted each individual driver's experience was unique, and the drivers' work was often controlled by third-party and government regulations. SGT stated that drivers who leased "LA City Cabs" were subject to the rules of the Los Angeles Department of Transportation, and drivers that took trips from LAX were subject to the Department of Airports' rules and regulations. Drivers that accepted Access trips were required by Access to follow its rules, and drivers that did school runs were required to follow another company's and various school districts' rules. Further, SGT claimed it did not require drivers to process credit card payments through the company, and drivers could set up their own merchant account or tools to process such payments. SGT also stated drivers that did house account trips, school routes, or Access trips could avoid paying the 10 percent processing fee if they elected to delay receipt of payment until SGT was paid by the account, which could be up to 60 days.

SGT asserted its business evolved during the proposed class period. According to SGT, "Between February 2010 and

8

approximately January 1, 2013, SGT: (a) leased taxicab vehicles (including certain 'Bell Cabs' and 'LA City Cabs') and equipment to professional drivers (but not [Gonzales]); (b) operated a dispatch service for professional taxicab drivers who chose to utilize it; and (c) provided insurance, marketing and other support services to independent taxicab owners and drivers. After approximately January 1, 2013, SGT: (a) no longer leased 'Bell Cabs'; (b) no longer operated general taxicab dispatch services; (c) only leased 'LA City Cabs' to independent drivers as one of many members of LA City Cab; and (d) the only trips SGT offered to taxicab drivers—regardless of whether they leased a taxicab from SGT—were Access trip offers. Since at least April 2016, SGT has not contracted with any taxicab drivers, has not dispatched any trip offers—Access or otherwise—to taxicab drivers, has not paid taxicab drivers, and has only done business with independent taxicab dispatch companies."

SGT argued individualized issues predominated when the ABC test and the *Borello* test were applied and there was no common proof that applied to all drivers within the putative class. SGT also argued that Gonzales failed to meet his burden of showing that liability for the individual Labor Code claims could be established through common proof on a classwide basis. Lastly, SGT asserted Gonzales failed to show classwide litigation would be a superior method of adjudication because factual disparities would make class treatment unmanageable and mini-trials unavoidable.

## D.    The Trial Court's Ruling

The trial court denied Gonzales's motion for class certification. The court found Gonzales demonstrated

9

numerosity, the existence of an ascertainable class, adequacy of representation, and that his claims were typical of other class members. But the court found Gonzales failed to show common questions capable of resolution from common evidence to establish SGT's liability as to all drivers for the entire class period.

The trial court found common questions of law or fact did not predominate when the ABC test[5] or the *Borello* test was applied.[6] The court determined there was not common evidence during the proposed class period from which a trier of fact could determine whether SGT exercised control over all the drivers. The court found drivers were subject to different rules and requirements depending on the trips they completed and that the

---

[5] The trial court determined the following causes of action were rooted in Wage Order No. 9: (a) first cause of action for unpaid wages; (b) second cause of action for failure to pay minimum wage; (c) third cause of action for failure to pay overtime compensation; (d) fourth cause of action for failure to provide meal and rest periods; (e) fifth cause of action for failure to furnish accurate wage and hour statements; (f) ninth cause of action for unfair business practices to the extent it is based on wage order violations; and (g) eleventh cause of action for recovery of deductions from wages. Additionally, the court noted that all the Labor Code claims from September 4, 2020, to the present were also subject to the ABC test. (See *Parada v. East Coast Transport Inc.*, *supra*, 62 Cal.App.5th at p. 699, fn. 2.)

[6] Regarding the causes of action not rooted in Wage Order No. 9, the trial court found the following claims from February 14, 2010 (the beginning of the class period), until September 4, 2020 (the effective date of § 2775), subject to the *Borello* test: (a) sixth cause of action for waiting time penalties; (b) seventh cause of action for failure to reimburse business expenses; (c) ninth cause of action for violations of the UCL to the extent it is based on non-wage order violations; (d) tenth cause of action for misclassification as independent contractor; and (e) twelfth cause of action for coercion.

10

method of dispatch varied over the proposed class period. The court also found the fluctuations in SGT's business model over the class period created problems in analyzing whether class members did work outside SGT's usual course of business, so individual inquiries would be required to compare what drivers did with what the "heart" of SGT's business was at any given time. The court found individual inquiries would likewise be required to determine whether class members were engaged in an independently established trade or occupation of the same nature as the work performed for SGT.

Furthermore, the trial court observed Gonzales did not address whether the claims, other than misclassification, presented common questions of law or fact. The court stated resolution of the misclassification issue alone would be insufficient to establish SGT's liability for the alleged wage and hour violations, and Gonzales failed to show how SGT's liability for these claims could be determined without individualized inquiry. Further, the court concluded it could not certify a subclass because Gonzales did not show numerosity as to any subclass, nor did he show how the non-misclassification claims would be addressed. Lastly, the court concluded Gonzales failed to show a class action would be superior to other methods of adjudication as there were several flaws with Gonzales's proposed trial plan.

Gonzales timely appealed.

11

## DISCUSSION

### A. Class Certification Principles and Standard of Review

A lawsuit may proceed as a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., § 382.) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

"'[T]he "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'" (*Brinker*, *supra*, 53 Cal.4th at p. 1021.) "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" (*Ibid.*) "[C]lass treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment"' on common issues." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28 (*Duran*).)

"In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues

12

is just as important as the existence of common questions uniting the proposed class." (*Duran*, *supra*, 59 Cal.4th at p. 29; see *Gonzales*, *supra*, 40 Cal.App.5th at p. 1149 [The focus is on "whether issues shared by the class members are sufficiently uniform to permit class[ ]wide assessment, and whether individual variations in proof on those issues are manageable"].) A trial plan may help a court determine whether a class action is manageable. (See *Payton v. CSI Electrical Contractors, Inc.* (2018) 27 Cal.App.5th 832, 844–845). However, a trial plan that lacks detail and does not show how individual issues would be tried is inadequate. (*Ibid.*)

"'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.'" (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089.) Any valid pertinent reason will be sufficient to uphold the order. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-on Drug Stores*).) We review a trial court order denying a motion for class certification for abuse of discretion and will not disturb it unless it is unsupported by substantial evidence, rests on improper legal criteria, or rests on erroneous legal assumptions. (*Ayala v. Antelope Valley Newspaper, Inc.* (2014) 59 Cal.4th 522, 530 (*Ayala*).) In determining whether individual or common questions predominate, we must presume in favor of the court's order "'the existence of every fact the trial court could reasonably deduce from the record.'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

**B. The Trial Court Acted Within Its Discretion in Denying Certification of the Proposed Class**

SGT does not dispute the trial court's finding that Gonzales established the elements of numerosity, an ascertainable class, and adequacy of representation. Further, SGT has forfeited any claim concerning the court's finding as to typicality. (See *Gonzales*, *supra*, 40 Cal.App.5th at p. 1156 [failure to substantively address issue forfeited any claim on issue]; *Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1509 [respondent forfeited argument by failing to support it with reasoned argument and citations to authority].) Consequently, the only issues in dispute are whether common questions or individual questions predominated and whether class treatment would have been superior to alternative methods of adjudication. We find the court did not abuse its discretion in denying Gonzales's motion for class certification.

1. *Substantial Evidence Supports the Trial Court's Finding that Common Questions Did Not Predominate Under the ABC Test*

In *Gonzales*, *supra*, 40 Cal.App.5th 1131, this court directed the trial court to apply the ABC test to certain Labor Code claims to determine whether the requirements of commonality, for purposes of certifying a class action, were satisfied. (*Id.* at p. 1165.) "Under the ABC test, a worker is presumptively an employee, and the hiring entity bears the burden to show otherwise. [Citation.] The ABC test is conjunctive, and the hiring entity's failure to establish *any* of the following three factors precludes a finding that the worker is an independent contractor: '(A) that the worker is free from the control and

14

direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.'" (*Id.* at p. 1154.)

The trial court found Gonzales failed to show common questions would predominate over individual issues if the ABC test were applied. Gonzales contends the trial court erred in denying class certification under the standards articulated in *Dynamex*. We disagree.

a. *Part A*

Under part A of the ABC test, "the question is whether drivers are free from [SGT's] direction and control 'both under [their contracts] for the performance of [their] work and in fact.'" (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1161.) In deciding Gonzales's motion, "the salient inquiry is whether there is 'a sufficient commonality of interest' within the proposed class (or subclasses) to permit the issue of whether SGT's drivers are employees or independent contractors 'for purposes of the wage order to be litigated on a class basis.'" (*Ibid.*)

Gonzales argues the trial court erred because it disregarded this court's instruction that "on remand the trial court's focus under prong A must be not simply on the leases and their terms, but on the nature and extent of SGT's actual direction and control of the drivers." (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1161) Gonzales argues the trial court made its determination under prong A based solely on the finding that

15

there did not appear to be any common lease agreement between SGT and all drivers.

The court did not make its determination simply based on the leases. The court did find drivers were subject to several different lease agreements with different terms indicating "greater or lesser indicia of control."[7] However, it also based its ruling on evidence outside of the leases.

Gonzales's argument that all drivers were treated as subject to the same "operational infrastructure" was refuted by evidence showing drivers were subject to different rules during the proposed class period. Declarations from several drivers, SGT's general manager and former manager of operations, and the rules and policies utilized by Access, school districts, and LADOT were supplied to the court. The declarations showed some drivers were subject to Access rules, including rules about accepting assignments and wearing uniforms. Other drivers drove school routes with their own unique requirements, and others were subject to different rules, such as those that picked up passengers at LAX. Further, LADOT and Access, which are government agencies, had rules and policies that required drivers to undergo background checks, drug and alcohol testing, training, and to wear uniforms, among other requirements. (See *Linton v.*

_____

[7]     For example, a July 30, 2007, lease agreement required taxicab inspections every 14 days at SGT's office, but a June 13, 2015, agreement did not require any such inspections. Further, the only agreement that required drivers to undergo training was a third July 14, 2008, agreement regarding Access services. Different agreements were used depending on whether a driver leased his vehicle, was an owner-operator, or chose to participate in an additional driving program. The circumstances under which a driver could be terminated varied under each agreement.

16

*Desoto Cab Company, Inc.* (2017) 15 Cal.App.5th 1208, 1223 ["A putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation"].)

The evidence also showed the methods of dispatch used by SGT varied over the proposed class period. The former manager of SGT's operations submitted a declaration explaining that between February 2010 and approximately January 1, 2013, SGT "operated general taxicab dispatch services (i.e., computerized and/or radio dispatch services that offered trip opportunities to local independent taxicab drivers)." After approximately January 1, 2013, SGT no longer operated general taxicab dispatch services and only offered Access trips to taxi drivers. SGT's general manager declared that since at least April 2016, SGT has not dispatched any trip offers, including Access trips, to taxi drivers. Dispatch services are instead provided by third party companies.[8] This indicated the control exerted by SGT over class members varied.

Gonzales largely relies on a federal case, *James v. Uber Technologies Inc.* (N.D. Cal. 2021) 338 F.R.D. 123 (*James*), in asserting adjudication of part A of the ABC test was appropriate

---

[8] Gonzales filed declarations from various drivers stating they could not reject trip offers from SGT dispatchers. However, several drivers contradicted their declarations with their deposition testimony, stating they were able to reject dispatch trip offers and determine their own routes. "[I]f the parties' evidence is conflicting on the issue of whether common or individual questions predominate . . . , the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met." (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 991.)

17

on a classwide basis.  In *James*, defendant Uber, in opposition to the plaintiffs' motion for class certification, argued individual issues predominated as to part A because Uber changed its contract during the proposed class period to give "drivers much more flexibility and independence, creating several 'variations in drivers experience with the app.'" (*Id.* at p. 135.)  The district court rejected Uber's argument, finding that all drivers were "subject to the same uniform terms of Uber's standardized 'Platform Access Agreement,' even if only some of them [took] advantage of the new flexible terms of that agreement." (*Id.* at p. 136.)  The court also rejected Uber's argument that class certification was inappropriate under prong A because it used three different agreements over the relevant class period.  (*Ibid.*)  The court found the differences were not determinative to the outcome of the prong A analysis, as there was evidence the agreements were not materially different.[9] (*Id.* pp. 136–137.)  *James* is distinguishable.  Gonzales did not demonstrate class members in this case were subject to any uniform agreement, or that the differences between the lease agreements were immaterial or irrelevant to the issue of control.

Gonzales, therefore, does not demonstrate the trial court failed to follow the directions in *Gonzales*, *supra*, 40 Cal.App.5th 1131, in analyzing whether there was a sufficient commonality of interest among proposed class members to litigate part A of the

---

[9]     The *James* court also stated the existence of multiple agreements was insufficient to establish that individual issues predominated under part A because "the Court could easily certify subclasses consisting of drivers who provided services under each of the three operative agreements throughout the class period." (*James v. Uber Technologies Inc.*, *supra*, 338 F.R.D. at p. 137.)  We address the issues the trial court found with certifying a subclass below.

18

ABC test on a class basis.  Moreover, substantial evidence supports the finding that there was insufficient common proof to enable the trier of fact to determine whether SGT controlled the manner in which all proposed class members performed their work during the proposed class period.  (See *Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. 338, 350 [The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"].)

    b.  <u>*Part B*</u>

 "Part B of the ABC test requires a business to demonstrate 'that the worker performs work that is outside the usual course of the hiring entity's business.'  [Citation.]  This part of the test seeks 'to bring within the "employee" category *all* individuals who can reasonably be viewed as working "*in [the hiring entity's] business*" [citation], that is, all individuals who are reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor.  [Citation.]'" (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1154.)  "'Workers whose roles are most clearly comparable to those of employees include individuals whose services are provided within the usual course of the business of the entity for which the work is performed and thus who would ordinarily be viewed by others as working in the hiring entity's business and not as working, instead, in the worker's own independent business.'" (*Id.* at p. 1155.)  An employer fails to make the necessary showing if a court finds the

19

work performed is not merely incidental to the employer's business, but instead is an integral part of it.  (*Ibid.*)

Gonzales argues the trial court erred in ruling that part B was not susceptible to common proof after finding SGT's business model fluctuated over the class period.  He argues the evidence did not show SGT's business model actually fluctuated.  We find substantial evidence supports the court's conclusion.

The record contains declarations from former and current SGT managers describing the way its business model changed over the years.  Between February 2010 and approximately January 1, 2013, SGT leased taxicab vehicles (including "Bell Cabs" and "LA City Cabs") and equipment to drivers, operated general dispatch services for taxicab drivers, and provided insurance, marketing, and advertising services to drivers.  After about January 1, 2013, SGT dispatched trip offers only for Access to drivers in Bell Cabs, which SGT had stopped leasing.  Since April 2016, SGT has not contracted with any taxicab drivers or dispatched any trip offers.  Furthermore, the managers' and drivers' declarations submitted in the trial court showed transportation services drivers provided were not common across the class, as some provided general taxicab services, some drove Access passengers, some did school runs, and some did a combination of these services.  Because SGT's business evolved throughout the class period, determining whether class members did work outside SGT's usual course of business would vary depending on the period and require individual inquiries.  The trial court could reasonably conclude there was a lack of common evidence to determine, on a classwide basis, whether the drivers performed work that was an integral part of SGT's business during the class period for purposes of part B.

20

Gonzales also suggests the trial court could have closed the class period in 2016 to address the fluctuations in SGT's business. But Gonzales neither offers authority for the proposition that the court's failure to do so constitutes reversible error, nor does he show the members of such a class or subclass would be sufficiently numerous. Additionally, Gonzales contends he presented sufficient evidence that the work done by class members was within SGT's usual course of business. However, it is not appropriate for us to reweigh the evidence. (*Kizer v. Tristar Risk Management* (2017) 13 Cal.App.5th 830, 841 (*Kizer*) ["'In determining whether the record contains substantial evidence supporting the ruling, a reviewing court does not reweigh the evidence and must draw all reasonable inferences supporting the court's order'"].) "'[I]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'" (*Sav-On Drug Stores*, *supra*, 34 Cal.4th at p. 331.)

c. *Part C*

To establish a worker is an independent contractor, part C of the ABC test requires the hiring entity to show the worker is "'customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.'" (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1155.) "[T]he inquiry is whether the worker 'independently has made the decision to go into business for himself or herself.' [Citation.] This factor is established with evidence that the worker has 'take[n] the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to

21

provide the services of the independent business to the public or to a number of potential customers, and the like.' [Citation.] Critically, part C requires the hirer to show a worker *actually be engaged* in an independent business, *not merely that he or she could be.*" (*Ibid.*)

The trial court concluded the inquiry under part C of the ABC test would involve factual disparities among drivers "not amenable to class treatment." The trial court noted that unlike the class certified in *Dynamex, supra*, 4 Cal.5th at p. 966, Gonzales's proposed class does not exclude drivers that performed services for companies other than the defendant, such as other taxi companies.

Gonzales argues the trial court erroneously interpreted *Dynamex* as requiring him to exclude drivers who performed similar services for other hiring entities. However, the trial court did not hold this exclusion was a requirement under *Dynamex*. Rather, the court distinguished the facts of *Dynamex*. It explained why the variations between Gonzales's proposed class members were such that part C was not susceptible to common proof as it was in *Dynamex*.

Further, Gonzales contends the court erred because drivers did not set up their own businesses outside of SGT. In making this argument, Gonzales does not show there was common proof that proposed class members engaged in their own businesses. Rather, he points to a single letter dated March 22, 2005 (about five years before the proposed class period), concerning a single driver, and sent to the "Business License Office" of the City of Arcadia by SGT. SGT wrote, "Our driver, Francisco G. Contreraz, applied for his business license while working for AAA Taxi Co." and requested his business license "be changed to show

22

he now works for [SGT]." The letter does not show that all drivers drove exclusively for SGT and had no distinct business of the same nature as SGT.

Moreover, there was evidence provided by SGT's general manager showing drivers received trip offers from non-SGT dispatchers. Further, some drivers gave passengers their own business cards so that passengers could arrange for transportation directly with them. A trier of fact could plausibly conclude some of the proposed class members were engaged in an independently established business under part C, while others were not. This would require individual inquiries on a case-by-case basis.

d. *Subclasses*

In connection with parts A and C of the ABC test, Gonzales contends the trial court abused its discretion in finding a lack of commonality for the proposed subclasses concerning drivers that did Access trips and school runs. The trial court, however, found Gonzales did not present any evidence showing the proposed subclasses were sufficiently numerous. The court also found Gonzales did not demonstrate, even with regard to a limited class, how issues of liability concerning non-misclassification claims would be addressed (discussed further below). Gonzales does not challenge these findings on appeal. Accordingly, he does not demonstrate the trial court abused its discretion in not certifying a subclass. (See *Sav-On Drug Stores*, *supra*, 34 Cal.4th at pp. 326–327.)

2. *Substantial Evidence Supported the Finding that Individual Questions Predominated Under the Borello Test*

As to Labor Code claims not seeking to enforce wage order requirements, the trial court was to apply the *Borello* test to determine whether commonality requirements for purposes of certifying a class action were satisfied. (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1165.) Following the enactment of section 2775, the trial court determined Gonzales's claims from February 14, 2010, to September 4, 2020, that were not rooted in Wage Order No. 9 were subject to the *Borello* test.

Under *Borello*, "'"[t]he principal test of an employment relationship [was] whether the person to whom service is rendered ha[d] the *right to control the manner and means of accomplishing the result* desired."'" (*Ayala*, *supra*, 59 Cal.4th at p. 531.) *Ayala* clarified the application of the *Borello* test for Labor Code violations by identifying numerous "secondary indicia" for assessing whether a common law employer-employee relationship exists. (*Ayala*, at p. 532.) These factors are: "'(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the

24

relationship of employer-employee.'" (*Ibid.*) "'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.'" (*Borello*, *supra*, 48 Cal.3d at p. 351; but see *Ayala*, at p. 532 ["the hirer's right to control the work is the foremost consideration in assessing whether a common law employer-employee relationship exists"].)

The trial court began by noting that as it had found with regard to part A of the ABC test, the extent of SGT's right to control the work was not susceptible to common proof. Gonzales again argues the trial court erred by failing to consider evidence beyond the lease agreements entered into by class members. For the same reasons discussed above with regard to part A of the ABC test, we reject Gonzales's contention.

Additionally, Gonzales asserts that SGT's relationship with class members bears the secondary indicia of an employment relationship. Gonzales essentially identifies and requests we reweigh the evidence in his favor, which we cannot do. (*Kizer*, *supra*, 13 Cal.App.5th at p. 841.) We find substantial evidence supports the trial court's findings that individualized questions of fact and law predominate in the analysis of secondary indicia.[10]

When considering whether drivers were engaged in a distinct occupation or business, the trial court noted Gonzales did not present any evidence showing class members performed the same tasks. The declarations SGT's drivers submitted demonstrated they instead operated in various, individualized

---

[10] The trial court found the factor concerning skill required in the occupation weighed in favor of class certification because the skill required of drivers presented common questions of law or fact. As to other secondary factors, the court found that on balance individualized questions of fact and law predominated.

25

ways. For example, some drivers used the dispatch services, but others did not. Some, but not all, drivers chose to become eligible for Access trips. Some drivers also added they chose where they wanted to work, including what municipalities or whether to pick up passengers from LAX. Additionally, some drivers developed personal relationships with passengers or companies to directly arrange trip services, and others did school runs. This evidence supports the court's determination that common proof would not demonstrate whether class members were engaged in a distinct occupation or business.

Concerning who supplies facilities or instrumentalities, some drivers stated that SGT supplied a radio, meter, and computer for drivers to use. However, the extent to which SGT supplied additional equipment to drivers varied. Some drivers stated they leased vehicles from SGT, while others supplied their own vehicles or leased them from third parties. Further, drivers said they independently chose the specific municipalities and routes in which they operated. Regarding whether the drivers believed they were creating the relationship of employer-employee, several drivers declared they did not consider themselves to be employees. Consequently, there was substantial evidence indicating individual inquiry would be required to analyze the secondary *Borello* factors.

Because substantial evidence supports the trial court's findings, we cannot say the court abused its discretion.[11]

---

[11] The trial court also determined that because Gonzales's claim for unfair competition under Business and Professions Code section 17200 was derivative of the wage order and non-wage order causes of action, the court's findings under the ABC test and *Borello* equally

26

### 3. *Gonzales Did Not Demonstrate the Labor Code Claims were Subject to Common Proof on a Classwide Basis*

Gonzales did not address in the trial court whether the individual Labor Code claims presented common questions. Nor did he respond in his reply brief to SGT's contention that he failed to show liability for the wage and hour violations was susceptible to common proof.

"Misclassification "'is only part of the equation.'"" (*Wilson v. La Jolla Group* (2021) 61 Cal.App.5th 897, 913 (*Wilson*).) Resolution of the misclassification issue alone is insufficient to establish that common questions predominate as to liability for the individual Labor Code claims. (See *Sotelo v. MediaNews Grp., Inc.* (2012) 207 Cal.App.4th 639, 654–655, disapproved on other grounds in *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15; see also *Kizer*, *supra*, 13 Cal.App.5th at p. 841 ["Evidence of an employer's uniform policy to misclassify a group of employees as exempt from overtime requirements is not sufficient to support class certification because misclassification alone does not establish liability for overtime violations"].) "[S]imply having the status of an employee does not make the employer liable for a claim for overtime compensation or denial of breaks. An individual employee establishes liability by proving actual overtime hours worked without overtime pay, or by proving that he or she was denied rest or meal breaks. A class, on the other hand . . . may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work

applied to the unfair competition claim. Gonzales does not challenge this ruling on appeal.

27

overtime hours without overtime pay, or to miss rest/meal breaks." (*Sotelo*, at p. 654.)

By not addressing whether the individual Labor Code claims presented common questions, Gonzales fails to show SGT's liability for the alleged wage and hour violations could be proven on a classwide basis. (*Sotelo*, *supra*, 207 Cal.App.4th at pp. 654–655; see *Wilson*, *supra*, 61 Cal.App.5th at p. 917 [plaintiffs' claims for overtime pay and meal and rest break violations were dependent on hours worked, and plaintiffs did not show defendant's liability for claims could be proven by classwide proof].)

4. *The Trial Court Did Not Abuse Its Discretion in Finding Gonzales Failed to Show Class Treatment was Superior*

The trial court determined Gonzales failed to show the class action procedure was superior to other methods for adjudicating the controversy. We agree.

Gonzales makes the conclusory assertion that class treatment is superior because "[a]ll of the issues involved here are common to the proposed class and subject to common proof," but he provides no specifics and cites no evidence in support of this statement. For the reasons discussed above, substantial evidence supported the trial court's findings that individual, not common, issues predominate in this case.

Gonzales also points to the efficiency and efficacy of class actions in general, but again, he provides no details or record citations to show that the class action procedure provides a superior method of resolving the issues in this case. Thus, he has

forfeited his argument.  (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)

In any event, Gonzales does not address the flaws in his trial plan identified by the trial court.  The court properly considered the manageability of individual issues in deciding whether a class action was a superior device for handling the controversy presented.  (*Duran*, *supra*, 59 Cal.4th at p. 29.)  First, it found that although Gonzales offered to provide expert testimony and statistical analysis to establish independent contractor liability, Gonzales did not show what expert or statistical evidence would be used.  (*Id.* at p. 32 ["Rather than accepting assurances that a statistical plan will eventually be developed, trial courts would be well advised to obtain such a plan before deciding to certify a class action"].)  Second, the court found the trial plan "did not address in any way how liability as to the non-misclassification claims will be shown."  Finally, the court found Gonzales failed to address how SGT's defenses, including its defense that many class members agreed to arbitrate, would be handled without significant individual inquiry.  Gonzales does not show that the court's findings were unreasonable.

Based on the foregoing, we will not disturb the trial court's determination that Gonzales did now show a class action was superior to other methods of adjudication.

## DISPOSITION

The judgment is affirmed.  SGT is awarded costs on appeal.


MORI, Acting P. J.

We concur:


ZUKIN, J.


**SIGGINS, J.

---

** Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.